## Kelly v. Kelly.

### (Decided February 4, 1919.)

### Appeal from Boyd Circuit Court.

1. Husband and Wife—Alimony.—If a husband abandons his wife
without a legal reason for so doing, he may be required to pay
alimony.

2. Husband and Wife—Abandonment.—Mere fits of ill temper and
occasional quarreling and scoldings by the wife, will not justify
a husband in abandoning his wife, unless his personal safety is
endangered.

3. Husband and Wife—Alimony.—A wife will not be denied alimony,
where she is not guilty of any moral delinquency, and her husband
has abandoned her, although she is not entirely blameless, if the
husband was a participant in the causes of the shortcomings,
which led to the separation.

4. Husband and Wife—Alimony—Discretion of Chancellor.—The
amount of permanent alimony to be allowed a wife, because of
desertion by her husband, is confided to the sound discretion of

the chancellor, who may take into consideration, the amount of the husband's estate, his present and future prospects, his earnings and ability to earn money; his dependents, in the way of children, and the particular cause of the separation.

B. O. BECKER, GEO. B. MARTIN and JOHN L. SMITH for appellant.

JOHN F. HAGER and JOHN W. WOODS for appellee.

OPINION OF THE COURT BY JUDGE HURT—Affirming upon appeal, and reversing upon cross-appeal, in part.

The parties to this action were reared in the city of Ironton, Ohio, where they were married, on June 12, 1900. The husband, having employment, in Ashland, Ky., they removed to that city to live, where in the month of March, 1903, twin children were born to them. These children are boys, and are now fifteen years of age, and have been, since they were ten years of age, attendants at a military school, near Cincinnati, Ohio, except during the usual vacations, at such schools. When the parties were first married, they resided, for some time, in a home, which was owned by the husband's mother, in Ironton, and after they came to Ashland, the mother of the husband sold the house and gave him the proceeds, in the way of assisting in the purchase of a dwelling house, in Ashland, and afterwards, gave him two thousand dollars, with which to purchase additional ground near the house, and purchased and lived in a home adjoining the home of appellant and appellee. The father of the husband died, a year or two before he and his wife separated and the husband received a considerable amount of property, under the will of his father.

The residence was in a neighborhood, composed of people of eminent respectability, and well circumstanced financially, and several were wealthy. Several were of that class, whose health and comfort made necessary their periodical attendance at watering places and pleasure resorts, where the rates were high, and golf courses a necessity, and now and then a visit to a foreign country, to vary the monotony of life.

The evidence, proves, that the husband was a good husband and father; that he made ample provisions for his wife and two sons in accordance with their station in life, in the circle of society, in which they moved. He was

sober and industrious, and attentive to his business affairs, and of unchallenged moral character. The wife was of unimpeachable moral character; a kind and affectionate mother; an excellent housekeeper; and possessed the very commendable trait of remaining more closely at her home and attending more strictly to her duties as a wife and mother, than any other woman in her social circle, in her neighborhood. The first appearance, in the record of any friction between the husband and wife was when in the year, 1912, the husband appeared at the home of the wife's father, in Birmingham, Ala., and represented to his father-in-law, that his wife did not treat his friends right, and that they were not agreeing, and that some change would have to occur to enable them to live agreeably. The father-in-law, immediately, addressed a letter to his daughter, in which he counseled her to live agreeably with her husband, and advised, that they, mutually, forbear with each other. Afterwards, the father-in-law, came, twice, at the request of his son-in-law, and he and his son-in-law, and his daughter discussed the causes of the differences, between them. The husband claimed, that the wife did not treat his friends in a proper way, while the wife complained, that her husband's mother intermeddled with her affairs, and her husband, continuously, neglected her, by remaining out to a late hour, at night, and left her in the house, alone. Every witness, who testified, except certain ones, which will hereafter be mentioned, deposed, that so far as they ever had opportunity to see or know, the appellant and appellee treated each other kindly, and no friction was observable between them. On the 26th day of June, 1913, the husband left the house, taking with him, certain of his personal belongings, and one of his sons, and, has since that time, persistently, refused to return to his wife, or to become reconciled to her. On the same day, the wife, in great distress, called upon her mother-in-law and interceded with her to try to influence her husband to return to her, but the mother-in-law declined to do so. She frequently, called upon him, at the house, in which he stayed, after that time, and on one occasion, in the presence of others, requested him to return. She sought the assistance of the minister, who officiated at the marriage rites between them, and of the archdeacon of the diocese, in which the church of which

she was a member is situated, to effect a reconciliation with her husband and to induce him to again live with her, as her husband. These reverend gentlemen, after several requests to the husband, by letters, which he ignored, secured a meeting between the husband and wife, for the purpose of trying to induce him to again resume marital relations with his wife. He appeared at the meeting, accompanied by his attorneys, but, refused to discuss living with his wife any more, but proposed, that she obtain a divorce, and that he would settle certain sums upon her, in the way of alimony. On this occasion, he said to his wife, that her treatment of his mother, had "killed" his love for her. In May, 1916, he instituted a suit for divorce from his wife, in which he charged her with having abandoned him, but this, he dismissed, in July following. The wife, as it appears, never ceased to intercede with her husband to become reconciled to her, and in this suit, again besought him to return to her.

This suit was instituted by the wife, in December, 1916, to require the husband to pay her the sum of $50,000.00 and for the use of the dwelling during her lifetime, as alimony. The court adjudged, that she recover of her husband, the sum of $33,500.00, her costs, and attorneys' fees, and adjudged her the right to use and occupy the dwelling house, under certain restrictions. The dwelling house is agreed to be of the value of $12,500.00. The husband was required to maintain and educate the boys, except at such time, as they should be with their mother, when she should be at the expense of their board. There is no complaint made of the decree so far as it relates to the custody, education and maintenance of the boys. The husband has appealed from the judgment, and insists, that the court was in error, in adjudging to the wife, any alimony; while the wife has prayed a cross-appeal from the judgment and insists, that the alimony allowed, was not in such sum, as she is entitled to have.

(a) The record discloses, that there is no hope for a reconciliation of these litigants; that the wife is anxious to resume marital relations with the husband, but, he has a fixed aversion to the wife, and fixed determination to never live with her, again; and has removed from Ashland to the city of New York. It is admitted, that he separated himself from his wife and refused to return to

or live with her or permit her to live with him, at any place. He denies, that he left his wife without excuse or fault upon her part, and alleges as his reason for so doing that she did not control her temper, but, continuously, for two years, nagged, and scolded him, gave way to fits of temper, insulted his friends, and humiliated and embarrassed him, and utterly destroyed his happiness, while with her, and that he had no other means of escaping the troubles, except to leave her. The only evidence, which tends to prove, that she ever quarreled or scolded him, is that of a negro man, who was for several months, a servant in the house, and he states that she, frequently, quarreled at her husband, but, he does not state anything that she ever said, or any subject, about which a quarrel was had. This witness is a strong partisan of the husband, as he claims, that the wife insulted him, at some time since the separation, by a refusal to allow him to serve her with punch, at a social function, and, accompanied her refusal, by calling him a "stinking" negro. Another servant, who was in the house at the same time, the one mentioned above was serving, deposes, that she never "heard a fuss between them." The witness, who claims to have received the insult, is contradicted by another, who was present, when the alleged insult was given, and who deposes, that it did not occur. The mother of the husband deposes, that on the day of the separation, when the wife, weeping, besought her to use her influence to restore her husband to her, she said, she had treated her husband badly, because she was jealous of his regard for his mother. A lady, at whose home, the husband lived, after the separation, deposed that on one occasion, the wife, when visiting the house, said that she did not blame her husband for leaving her, because she had been a "devil" to him for a year. The evidence, further shows, that the wife was of a nervous temperament and suffered from a nervous affliction, and within a few days, after the separation, was confined for several weeks, to her bed, from neuresthenia, or nervous prostration, and for a portion of the time, was in an unconscious condition, and a few months later, suffered from a similar attack. The insults to friends of the husband, complained of, are as follows: In the year 1907, six years preceding the separation the husband was attacked with typhoid fever, and while confined to

his room, a witness, visited him each day, and on one occasion, the wife answered the door-bell and said: "Why, are you here again?" and turned away without accompanying him to her husband's room. During the same attack of fever, a witness, who had charged the wife to not allow any one to go to the sick room except a nurse or physician, and not to permit her husband to know, what was the matter with him, later returned and informed him of the nature of the disease. When the wife learned this, she called the witness over the telephone and said to him, that her husband had grown worse since being told, with what he was afflicted, and that if witness returned, she would "shoot his brains out." The witness says, that she, at the time, was in a hysterical condition. A few weeks preceding the separation, the wife started upon a journey, with friends, to be gone over night, and enjoined upon her husband to take care of the little boys. She did not go, only, a part of the journey and returned home, between seven and eight o'clock, at night. The boys were not at home, when she arrived. The husband had invited two friends to visit him upon that evening. When the wife found the boys from home she became excited, and urged her husband to go and seek the boys, which he declined to do, assuring her, that the boys were safe, and in her conversation, she accused her husband of failing to keep his promise, and insinuated, that his company were "cheap politicians," and the automobiles, owned by them, were not of the best. Nine or ten years, before the separation, she, on one occasion, became angry with her mother-in-law, and at a later date, cut down flowers which the mother-in-law had planted in the yard of her son. Upon the whole, it may be inferred, that the wife, unfortunately, had more temper, than was conducive to never failing agreeableness, but, the above, are the proven instances of its exhibition, during thirteen years of married life. While it may be inferred, that there were other occasions, when she made exhibitions of a bad temper, upon this evidence, it can not be inferred or presumed, that she habitually allowed it to control her, in her actions, toward her husband, and if she did not hesitate to make a public exhibition of her temper, as is charged against her, the occasions, when she allowed herself to be influenced by it, are few. If the husband, for a year or two, continuously, remained out,

until a late hour with his friends, and left his wife alone, and this seems to have been proven; and if he promised to care for the little boys, and they were away from home, at night, at eight o'clock, while they may have been perfectly safe, it can not be said, that her exhibitions of temper on these occasions were entirely without excuse, and free from any fault upon his part. The want of affection, between the wife and the husband's mother, appears to have been without any good reason, upon either side, and each is proven to have expressed a dislike for the other. The proof abundantly shows, that the husband's mother was a woman of fine character and no one gainsays it, but, the unexplainable dislike, sometimes, of husbands, as well as wives, for their mothers-in-law, is a part of the history and traditions of our race, and though usually such dislike is foolish and unwarranted, each one will have an opinion upon this subject, somewhat, in accordance with his experiences. In all of this, however, there appears no legal reason for the husband abandoning his wife, and thereafter, turning a deaf ear to all attempts at reconciliation upon her part, as though the wife had been guilty of some grave wrong, which human nature and morality could not tolerate. When men and women enter into the marriage relation, they take each other with all their weaknesses, faults and foibles, and must bear with each other, unless, the one or the other is guilty of something, which the law makes an excuse for abandonment. The complaints of the wife, about the use of the family automobile, and the attentions of the husband to his mother's company, are without any good reason, but, they constitute no reason for the husband to abandon his wife. The legislative authorities in this state, have never thought it necessary to provide any relief for a husband, on account of the temper of his wife. While subsection 3 of that clause of section 2117, Ky. Stats. which enumerates the grounds for a divorce on behalf of the wife, when not in like fault, provides, that she may obtain a divorce from the husband, on account of such cruel beating or injury, or attempts at injury as indicate an outrageous temper in the husband, or probable danger to her life, or great injury from remaining with him. The temper, it will be observed, which will justify a divorce from the husband, is one evidenced by cruel beating or injury, or at-

tempt at injury. By subsection 2, of the same clause, a divorce will be granted to her, if the husband, habitually behaves toward her, for not less than six months, in such cruel and inhuman manner, as to indicate a settled aversion to her, or to permanently destroy her peace and happiness. Not every sporadic exhibition of temper, or several such exhibitions, on the part of the husband, will justify the wife in abandoning him, if they are not habitual and do not show a settled aversion or permanently destroy her peace and happiness. It has never been held, that occasional petulances of temper, or rude language, by the husband, is sufficient ground to justify the wife in abandoning her husband. Beall v. Beall, 80 Ky. 675; Morrison v. Morrison, 10 R. 683.

To hold, that occasional outbursts of temper and sallies of passion, which were of such character, as not to show a settled aversion to the wife, or permanently destroy her peace and happiness, or to render it probable, that she would be in danger of losing her life, or bodily injury from remaining with her husband, do not justify, the wife in abandoning her husband; a holding that such exhibitions of temper or passion would justify the husband in the abandonment of his wife, would surely not rest upon any logical foundation. This court has continuously held, that mere fits of ill-temper by the wife or occasional quarréls with her husband, caused by her, or scolding by the wife, do not justify the husband, in abandoning his wife, in the absence of anything to endanger his personal safety. Canine v. Canine, 13 R. 124; Hodgen v. Hodgen, 160 Ky. 267; Logan v. Logan, 2 B. M. 142.

The purpose of the law is to impress upon parties to the marriage, that it is as permanent as their lives, and can not be thrown off for mere whims, or mere frailties, or shortcomings, of the parties, which do not amount to moral delinquencies, nor endanger life or person, nor permanently destroy happiness, and altogether a wife may be somewhat disagreeable, and make the marriage relation, frequently, unhappy, the husband has no legal right to abandon her. If he abandons her without legal right, the common law obligation still rests upon him to maintain and support her, and hence, she is entitled to alimony from him, and to be entitled to alimony, it is

not necessary, that she should be entirely free of fault, where she has been guilty of no moral delinquency, because such requirements, would give to the husband an undue advantage, and besides, most marital troubles, are to some extent, the fault of both parties. 1 R. C. L. 879; Green v. Green, 152 Ky. 486; Pore v. Pore, 20 R. 1980; Lacey v. Lacey, 95 Ky. 110; Anderson v. Anderson, 113 Ky. 389; Zumbeil v. Zumbeil, 113 Ky. 841; Club v. Club, 23 R. 650; Griffin v. Griffin, 8 B. M. 120.

(b)    As to the amount of the alimony, the proof shows, that the wife is entirely without property, and the principle applying, whether the granting of permanent alimony be considered as damages for breach of the marriage covenant, or the exercise of a sound judicial discretion, in providing for the wife an allowance out of the husband's estate, is that the alimony awarded, should be so apportioned, as to secure to the wife, the same social standing, comforts, and luxuries of life, as she would have had, but for the enforced separation, considering the amount of the husband's estate, and the care of the children, if any, and the circumstances and cause of the separation; the husband's present and future prospects and his ability to earn money. Muir v. Muir, 133 Ky. 125; Shehan v. Shehan, 152 Ky. 191; Green v. Green, 152 Ky. 486. Without discussing the various speculative opinions, given by many witnesses, as, to the value of the husband's estate, it appears for the purposes of this adjudication, that his estate is of the value of near to $150,000.00. There has never been a hard and fast rule adopted, as to what proportion of the estate of the husband, should be awarded the wife as permanent alimony, but it is a matter confided to the sound discretion of the chancellor, and each case has been determined upon the special facts and circumstances appearing and the adjudicated cases show, that the allowance has varied from a fifth to one-half of the husband's estate in cases, where divorce has been granted, as will appear from the following cases: Irwin v. Irwin, 107 Ky. 24; Muir v. Muir, 133 Ky. 125; McKean v. McKean, 83 Ky. 208; Hawkins v. Ragsdale, 80 Ky. 353; Fishle v. Fishle, 2 Litt. 338; Lockridge v. Lockridge, 3 Dana 28; Thornberry v. Thornberry, 4 Litt. 251; Lacey v. Lacey, 95 Ky. 110; Day v. Day, 168 Ky. 68; Quisenberry v. Quisenberry, 2 Duv. 197; Pemberton v. Pemberton,

169 Ky. 476; Murray v. Murray, 163 Ky. 546; Shehan v. Shehan, 132 Ky. 191; Thompson v. Thompson, 155 Ky. 608; Barlow v. Barlow, 90 S. W. 216; Hooe v. Hooe, 92 S. W. 317; McClintock v. McClintock, 144 S. W. 63; Pence v. Pence, 6 B. M. 496. It is gathered, however, from the adjudicated cases, that the weight of authority, is to the effect, that a rule allowing to the wife one-third of the delinquent husband's estate, is the proper proportion, but, the special circumstances of the various cases, have caused the courts, not to adhere to this rule, in the great majority of cases, as in many cases the husband's salary or earnings or ability to earn is all the estate he has, or he may have children to maintain, or, the particular cause of separation may influence the decision. Evidently, the wife should not be left in a worse condition, because of the wrongful desertion of her by her husband. In the instant case, the allowance is approximately one-third of the husband's present estate. It seems to be reasonably sufficient to provide the wife with a comfortable support, in accordance with the requirements of her past station in life, and her social environments. She asked that the use of the dwelling house be awarded her, as a part of her alimony, but, not under the restrictions, which the court placed upon its use. It can be seen, that under these restrictions, the house may become a burden to her and she will be compelled to use up the remainder of her allowance in maintaining a large house.

We are of the opinion, that the portion of the judgment decreeing to her the use of the house, should be modified as follows: that she have the use so long as she may desire to do so, and does not become the wife of another, with the conditions, that she keep it in a reasonable state of repair, and without the right to rent it and the husband pay the taxes thereon, but, in the event, at any time, she elects to give up the possession and use of the house, to the husband, she will give him notice of that fact, after which time, he will pay to her the sum of $50.00 per month, so long as she does not marry another, in lieu of the house, but, if the husband desires to do so, he may pay to her the sum of $12,500.00 which is practically the value of the use of the house for the period of twenty-six, and a fraction years, the period of the wife's probability of living and be discharged from

the obligation to pay to her the sum of $50.00 per month. In other respects the judgment is affirmed.

The judgment is therefore affirmed upon the appeal, and reversed upon the cross-appeal.