## Nall v. Nall.

May 6, 1941

356

Barnes, Smith & Howard for appellant.

A. J. Bratcher and J. R. Hines for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Reversing.

The appellant and appellee were married in June, 1921, and lived together as husband and wife until November, 1939, at which latter date appellant left appellee and brought this action seeking judgment of divorce and alimony in the sum of $10,000 and a pendente lite allowance of $100 per month. The ground of divorce alleged in the petition was cruel and inhuman treatment such as to indicate a settled aversion to her or to destroy permanently her peace and happiness, as provided in Section 2117, Kentucky Statutes, and Section 420 of the Civil Code of Practice. Appellant further alleged that her general health is bad; that she owns no property, has no income, and is not able to perform labor for her support and maintenance; that appellee is a stout, young, able-bodied man, educated and able to perform and does perform all necessary labors and duties in the conduct of his business and occupation as a farmer, and owns real estate of the value of not less than $11,000 and personal property of the value of $20,000. She further made the usual allegations for an order of attachment which she procured and caused to be levied upon appellee's property.

Appellee answered denying the allegations of the petition in reference to the cause of divorce and denied that his estate was of the value alleged by appellant, and further denied her right to alimony and allowance pen-

dente lite and also controverted the grounds of attachment. He further pleaded affimatively that for a period of more than six months previous to their separation appellant's conduct toward him had been cruel and inhuman, in that she had circulated false rumors that he was insane, incompetent and unable to manage his business; that she had sought out and talked to divers persons in an attempt to have him adjudged incompetent and to have his entire estate turned over to her; that as a direct result of such gross, inhuman, uncharitable acts and deeds on the part of appellant he had been injured in his business affairs and in his social life, and that such charges were wholly unfounded and known by appellant to be so at the time same were made and circulated by her. He further stated that he had every reason to believe and did believe that appellant is a moral, virtuous woman, but that for more than one year before the separation she had refused to consult and advise with him, but she sought the advice and counsel of other persons and allowed herself to become influenced, biased and prejudiced against him and thereby brought about the unfortunate circumstances which resulted in their separation; that she became an habitual faultfinder to the extent that nothing he did met with her approval. The reply consisted of a traverse only, thus completing the issues.

The evidence was heard in open court and taken in shorthand and transcribed by the official court stenographer. Upon consideration of the case the chancellor dismissed appellant's petition, but adjudged that all costs be paid by appellee plus $175 attorneys' fees for appellant's attorneys. Appellant excepted, prayed and was granted an appeal from the judgment insofar as it refused her a divorce and alimony, and appellee excepted and prayed an appeal from so much of the judgment as adjudged that he pay appellant's attorneys' fee, but no cross appeal was filed. The evidence is voluminous and, as stated by one of counsel in his brief, "A great amount of it is immaterial, incompetent and irrelevant to the issue made by the pleadings." The sole ground of divorce alleged and relied upon is cruel and inhuman treatment, hence we will confine our review to such evidence as may have a bearing upon the issue.

From the time of the marriage of the parties they lived with appellee's parents, one of whom died in 1935 and the other in 1937. It appears that during the life-

time of the parents, appellant and appellee had no trouble and lived an agreeable and compatible life. Appellant claims that after the death of appellee's parents he apparently lost all affection for her; that he was disagreeable and indifferent toward her and would not talk to her but little, and refused to discuss his business affairs with her and ceased his marital relations with her from about the first of July, 1938, until November, 1938. He then resumed relations with her and continued to recognize her as his wife until about April, 1939, and then again ceased relations with her until their separation in November, 1939; that she at no time refused him marital relations and his conduct toward her was not brought about because of any fault on her part. She further stated that appellee would use profane language in her presence and on one occasion when she undertook to talk to him he told her to "shut her d—— mouth." She further said that he would buy machinery for the farm and not tell her about it and sold some timber without her knowledge. She admitted, however, that her husband had an extensive farm business and gave it his personal attention, and was very busy. She said that as a result of her husband's treatment and conduct toward her she was caused to worry and suffer great mental anguish and pain and could not sleep at night and lost weight; that her husband was away from home a large portion of the time and in his absence she had the burden of looking after the farm; that she worked hard, even did some of the farm work in the field, sold chickens, eggs, and other farm products, and bought the larger portion of her own clothes.

Appellant was asked if she suspected her husband of being untrue to her, and she said she was afraid he was because he stayed away at night without any occasion, but that she never accused him of any improper relations with women until after she had planned to leave him, and he denied that he ever had any improper relations with any woman. She was asked what caused her to suspect him of being untrue and she said, "Just little things." On being asked to explain those things she said the first thing was a blackmail letter. She filed the letter as an exhibit with her evidence. The letter, dated July 27, 1939, reads in part:

"Mr. Nall.

"there is a few things I no about you such as

your goings on with the women at Hartford also the one at Centertown. Maybe your wife would like to know about the things you do. I will tell her everything if you don't bring me $25.00 at once. I need it bad.''

The letter then gave instructions as to when and where to leave the money, and was signed ''X Y Z''. Appellant says she got the letter out of their mail box and showed it to appellee and they discussed it. She said she insisted that he place the money at the place and the time designated in the letter and then watch and see who came to get it, but she did not know whether he did so or not. She said that she found another writing in appellee's billfold and asked him about it and he told her that a man gave it to him. This last writing, however, was not addressed to any person, nor signed by anyone. The trend of the subject matter or language contained therein had reference to sexual intercourse, much of the language being too vile to publish. Also, she found another writing in appellee's overall pocket which she stated was in his handwriting. On one side of the paper appeared the words ''size 10 hose for ————,'' (naming a woman whose name we omit), and on the other side of the paper appear the names of two women and contained language indicating that he had had intimate relations with them. She also found another writing in appellee's overall pocket which she said was also in his handwriting. It contained the names of five women and opposite three of the names appear the figures ''10½'' and opposite the other two ''10'' and ''9½'' respectively, indicating the size of hose they wore.

Appellant was asked about the condition of appellee's health and she said he was very nervous; that in 1938 he had fainting spells and fell on the floor; she suggested that he go to a doctor and he went to Dr. Threlkel and the doctor examined him and found that he had low blood pressure and said the fainting spells were due to that condition. He continued to have fainting spells in 1939, the year in which she left him, but she said she finally decided that he was feigning and she quit paying any attention to him and he then quit having those attacks. She denied circulating the report that her husband was crazy but admitted that she talked to a doctor about his condition and that the doctor suggested that she get a ''guardian'' for him. However, upon being

asked to state why she left her husband she testified as follows:

"165. Why did you leave? A. I left him because I ceased to love him and lost confidence in him.

"166. You lost respect for him and lost confidence in him? A. Yes, that is right.

"167. Was that due to his conduct toward you? A. Yes it was.

"168. Was it due to the things that you found out about him? A. On account of the cold way he treated me, and the way he was out buying hose and buying lunches."

A large number of other witnesses testified in behalf of appellant but the larger portion of their evidence is irrelative to the issue, but insofar as is relevant, it tended to corroborate the appellant.

Appellee testified that when appellant told him she was intending to leave him he tried to persuade her not to leave and also sought the assistance of friends and neighbors in trying to persuade her to change her mind. He denied that he ever intentionally mistreated his wife in any respect. He admitted, however, that on a few occasions when he became provoked at the farm hands he would do a "little cursing" but denied that he ever cursed his wife. He further specifically denied any improper conduct with any women and explained that the writings his wife found in his possession were given to him by men friends and that he just happened to have them in his pocket. He further explained that he had some connection with the agriculture office at Hartford where a number of girls were employed, and it became the custom among the employees to exchange Christmas presents and he did perhaps buy hose for some of the girls but his wife knew of it at the time. He said the girls had visited in their home and their reputation for morality was above question. He said he did not stay away from home exceeding four nights in the year 1939, and that was on occasions when he was away on business and the roads were bad, making it difficult for him to go home. He admitted that he probably did not give his wife the attention that he should but explained that he was very busy and working hard and his attention and mind was absorbed in his business.

A number of other witnesses who lived in the neigh-

borhood and had visited in the home of appellant and appellee, testified in behalf of appellee. One witness testified that appellant talked to him about appellee's condition and discussed the idea of having his business placed in the hands of herself or some other person. On the whole appellee's witnesses corroborated him and contradicted the evidence of appellant and a number of her witnesses, thus presenting a sharp conflict in the evidence.

After enumerating many alleged acts of cruel treatment, many of which are trivial and unmeritorious, appellant then says she left appellee because of the "cold" way he treated her and "buying hose and lunches." One of the alleged mistreatments consists of the fact that appellee bought farm machinery and sold timber without asking the advice of, or consulting with appellant. No argument is necessary to show that these acts did not amount to cruel treatment or afford grounds for divorce, or the abandonment of appellee. Another complaint is that appellee did not devote much of his time to talking to appellant in a friendly and sociable way, as well as failing to consult with her regarding his business affairs. It is shown by the undisputed evidence that appellee was a very busy, hard working man and it was necessary for him to be away from home looking after his farming interests during the day and occasionally stayed away at night. In appellee's situation we do not think that such was uncommon or amounted to cruel treatment in contemplation of the statute. While it has been held that when the husband ceases speaking to his wife such amounts to cruel treatment, but there is no claim by appellant that her husband refused to speak to her, but merely did not talk to her as freely as she conceived to be proper, particularly in reference to the conduct of his business affairs.

In reference to the purchase of hose for the girls who worked in the office with which appellee was connected, it appears that it was the established custom among the employees to purchase and exchange Christmas presents, and the purchase of the hose complained of by appellant was in accordance with an established custom. We think this complaint is also unmeritorious in that it falls far short of evidence of improper relations between appellee and the recipients of the Christmas presents, nor does it amount to cruel treatment of appellant.

The only charge made which has any semblance of merit is that appellee ceased to have marital relations with appellant for an interval during the year 1938 and also for a few months just previous to the time of their separation in 1939, which is not denied by appellee. But he attempts to explain his conduct by saying that he was very busy and worked hard. If appellant was entirely free from fault a different situation might have been presented. It is shown by the undisputed evidence of Dr. Threlkel that appellee was suffering from low blood pressure, overworked and in a physically weakened condition, as a result of which he had fainting spells. At first appellant seemed to be very much concerned about the health and condition of appellee but she says she finally decided that he was feigning and she quit paying any attention to him. Also, the preponderance of the evidence tends to show that appellant circulated the report in the community that appellee was crazy or at least mentally incompetent to take care of his business. Appellant denies that she circulated the alleged report that her husband was crazy but she admits that she discussed his mental condition with a doctor and perhaps others. According to the evidence of other witnesses appellant indicated that she was of the opinion that appellee was incompetent to take care of his business and asked the advice or the opinion of the witnesses as to what they thought about certain ones of the hired farm hands taking charge of the operation of the farm, or entrusting that duty to her. We find no evidence, however, indicating that appellee was insane or mentally incompetent. Dr. Threlkel testified that appellee's fainting spells were due to low blood pressure and perhaps other physical infirmities but he said nothing indicating that he was suffering from any mental disorder. We do not think there is any merit or justification in appellant's attitude and conduct toward appellee in respect of the charges she made against him, or of her indicated desire to have his business taken from his control and entrusted to her or some other person. Conceding that appellee's conduct toward appellant was not at all commendable, still the same is true of appellant's conduct toward appellee. It appears to us that the unfortunate situation brought about between the parties was contributed to by each of them, and hence neither is free from fault.

This court has never established any fixed rule as

to what is necessary to show cruel and inhuman treatment, such as to indicate a settled aversion. Each case must be considered in the light of the facts and surrounding circumstances. In Burns v. Burns, 173 Ky. 105, 190 S. W. 683, and Birdsong v. Birdsong, 182 Ky. 58, 206 S. W. 22, it is pointed out that the fact that the husband and wife do not get along pleasantly at times and that the husband is not as considerate and thoughtful of his wife at times as he should be, does not afford grounds of divorce by the wife upon the ground of cruel and inhuman treatment, and the conduct and behavior must be something of substance rather than occasional fits of temper or occasonal neglect and lack of proper consideration. Beall v. Beall, 80 Ky. 675; Kelly v. Kelly, 183 Ky. 172, 209 S. W. 335, 338. In Kelly v. Kelly, supra, it is said:

> "The purpose of the law is to impress upon parties to the marriage that it is as permanent as their lives, and cannot be thrown off for mere whims, or mere frailties or shortcomings of the parties, which do not amount to moral delinquencies, * * *."

This rule is applicable to both husband and wife.

The chancellor heard the evidence in open court and had the advantage of his personal observation of the witnesses which afforded him a better opportunity to weigh and judge the evidence than we have from a mere reading of the record. The chancellor was of the opinion that the proven facts and attendant circumstances were insufficient to justify the granting of a divorce to appellant and dismissed her petition. Upon a review of the evidence for ourselves we do not think that the judgment of the chancellor is contrary to the weight of the evidence to such an extent as to justify us to reverse the judgment to the extent of granting appellant an absolute divorce.

We have reached the conclusion, however, that the record before us clearly indicates that appellant and appellee have become so estranged as to render it impossible, or at the least highly improbable, that a reconciliation may be effected, or that they could hereafter live together in peace and happiness. Having these views, we think this case comes within the purview of Section 2121, Kentucky Statutes, which authorizes a judgment of divorce from bed and board.

In Ball v. Ball, 217 Ky. 337, 289 S. W. 259, the wife

instituted an action against her husband seeking judgment of divorce and for alimony. The husband denied her alleged grounds of divorce and counterclaimed, asking that he be granted a divorce. Upon review of the evidence and charges and countercharges of the respective parties, the court was of the opinion that neither of them had shown any substantial grounds for an absolute divorce, but directed that a judgment be entered divorcing the parties from bed and board and to allow the wife maintenance for herself and the children. The court said:

"The court's careful consideration of the evidence introduced by the respective parties in support of their contentions that they should be divorced upon the grounds pleaded has led to the same conclusion as that reached by the chancellor; trivial, and at most merely suspicious, circumstances and incidents having been magnified by the parties far beyond reason. When the situation of this young couple is considered, however, in the light of these circumstances which have been so magnified and further intensified by the respective grounds for divorce alleged in the petition and counterclaim, and their attempts to sustain them by proof herein, we have concluded that they doubtless can not live together as husband and wife in the peace and happiness that should attend such a union. We have concluded that, under the provisions of Section 2121, Kentucky Statutes, the chancellor should have entered a judgment divorcing them from bed and board, and should have required appellee to pay to appellant a reasonable amount for the support of herself and their two infant children. Our consideration of this record has led to the conclusion that in that way only can the respective rights and liabilities of the parties be protected and enforced. * * *"

We think that the proven facts and attendant circumstances revealed by the record before us, bring this case within the category of the case, supra.

Upon a return of the case the court will hear further evidence as to appellee's net income and enter judgment divorcing the parties from bed and board, and allow appellant alimony in a reasonable amount, taking into consideration her station in life and appellee's ability to pay.

Wherefore, the judgment is reversed to the extent indicated, and remanded for proceedings consistent with this opinion.