LOGAN
vs
LOGAN.'

CHANCERY.

*Case* 58.

*November* 1.

The case stated.

# Logan *vs* Logan.

APPEAL FROM THE FAYETTE CIRCUIT.

*Divorce.   Alimony.   Abandonment.*

CHIEF JUSTICE ROBERTSON delivered the Opinion of the Court.

ON the 5th of August, 1834, *Archibald Logan* and *Eleanor Robb*, each then nearly 70 years of age, intermarried at Lexington, after mutually signing a contract in writing, whereby they agreed that neither of them should claim, by survivorship or otherwise, any right to the property of the other.   Each of them had children by a former marriage, and had maintained a good and rather enviable reputation for personal honor, domestic virtues, and christian graces—he being a member of the second and she of the first Presbyterian church of the said city.

As might have been expected, they lived together in apparent harmony and happiness until early in February, 1838, when, for the first time, so far as we are informed, their domestic peace was disturbed by intemperate complaints and upbraidings upon her part for alleged griev-

ances, neither satisfactorily established nor explained by proof; and by responsive conduct upon his part, sometimes neither conciliatory nor the most prudent, and which tended rather to exasperate than to soothe the deeply moved feelings of his discontented and irritated wife. Their discord, soon becoming clamorous, attracted public observation which, instead of stifling, seemed only to inflame her heated passions. The intervention of friends, in and out of the church, invoked by *Mr. Logan* ostensibly for pacification, having failed and only added fuel to the flame, the prospect of cordial reconciliation became almost hopeless; and the irritability and wretchedness of the parties seemed so fixed and extreme as to indicate either the existence of some untold and deep-rooted grief or a destitution of that love and confidence which alone can happily cement the conjugal union, and without which wedlock is a curse.

At last *Mr. Logan,* expressing the conviction that a dissolution was inevitable, and declaring that he was "sinking fast"—rented his dwelling and left home, as he then announced and still admits, *"with a view to a permanent separation."* He directed his tenant, however, *"to treat Mrs. Logan well"* and permit her to *"remain as long as she chose."* On the next day she also left the house and has never since returned. During the same week, but after her departure, he returned and has since re-occupied the house alone. But, in less than ten days after his return, she sued him in chancery for alimony, charging him with enormous cruelty, aggravated by abandonment—in answering which he denied every allegation of improper conduct on his part, and averred that she had, by her own unprovoked misconduct, imposed on him the necessity of leaving her, as the only alternative consistent with their honor and happiness, the decorum of their neighborhood, and the interests of the church.

After the suit had been pending more than a year the parties agreed on the record that "the separation, *as exhibited in the pleadings* and *proof,*" still continued, and that the complainant should, on the final hearing, have the full benefit of that fact.

The Circuit Court decreed to *Mrs. Logan*, for *alimony*, an annuity of $500. He has appealed—insisting that she is entitled to no decree against him—and she assigns cross errors—claiming a larger allowance than that which the Circuit Judge made to her.

In revising the decree we shall abstain, as far as possible, from any allusion to disparaging facts characterizing a domestic tragedy so inscrutable in its origin, so disastrous in its character, and so lamentable in its results as that which the parties have unfortunately exposed on the record before us and on which our legal judgment is now required.

Whatever may have been the undisclosed origin or the secret history of this mysterious feud, the record, upon the face of which alone we must decide, does not sustain *Mrs. Logan's* accusatory allegations. And we are not allowed to doubt that she was not entitled to any relief, unless she had a right to it in consequence merely of abandonment.

Until the statute of 1800, abandonment alone was not a sufficient cause for a divorce *a mensa et thoro* and for alimony.

Independently of the enactment of 1800, simple abandonment, however protracted, would not authorize a decree for a divorce *a mensa et thoro* and for alimony. According to the ecclesiastical or common law of England, either *adultery* or *sævitia*—that is, *cruelty, endangering personal security*—authorized such a decree; but mere abandonment did not. It may be admitted, as intimated in *Butler* vs *Butler*, (4 *Litt.* 205,) that a husband who abandons his wife without cause, and *refuses* to either live with her or contribute to her maintenance, may be compelled by a court of equity to fulfil his legal and moral obligations in that respect. But Mrs. Logan's bill and proof do not bring the case within the range of the principle of that equity. Her bill was filed with no view to a decree for mere necessaries. It neither alleged that her husband had ever refused to pay for her necessary comforts nor suggested that he would not permit her to return to his house, or that she was even willing to do so, nor that she had ever proposed or desired a restitution of all conjugal rights. A suit for restitution of conjugal rights was the appropriate remedy in England for securing to an injured and deserted wife her rightful maintenance without being

divorced *a mensa.*   And unless she sought and was en-
titled to restitution she could not obtain a decree for sep-
arate *maintenance*—which was, as it always should be,
only alternative and ultimate relief, and (upon general
principles of equity and policy) never should be decreed to
a wife who had neither sought nor desired a restitution of
conjugal rights, and has no legal cause for a decree for
seperation.

The grounds re-
lied on in com-
plainant's bill
and the grounds
on which the
claim of com-
plainant is re-
sisted.

   *Mrs. Logan's* right to a decree for maintenance, as now
sought by her, must, therefore, depend on the legislative
act of 1800, .(*Stat. Law,* 121,) which authorises a decree
for alimony after an abandonment by the husband *for one
year.*   And her right to a decree under that enactment is
resisted on five grounds—1st, That there was no *"aban-
donment"* in the available and statutory sense.   2d, That
if there was such abandonment, it was justified by legal
cause.   3d, That the bill, having been filed prematurely,
ought, therefore, to have been dismissed.   4th, That she
is estopped by the anti-nuptial contract—and 5th, That
her own misconduct should bar her.   But, after careful
consideration, we have come to the conclusion that neither
of these objections should prevail.

Husband leaving
his house profes-
sedly with the
intention to re-
main away and
not living with
his wife, and his
returning again
on her leaving it,
is "abandon-
ment," statutory
and actual.

   1. *Mr. Logan's* answer alone is sufficient to show that
he had rented and left his house as one mode of effecting
a permanent seperation from *Mrs. Logan,* and that he
left *her* also with the fixed purpose of never again cohab-
iting with her, and without making or offering to make
any certain provision for her comfortable maintenance out
of *his* estate.   As soon as she had also left the house he
returned, and has never since intimated that he desired or
would permit her to return to, and again live with him as
his wife; thereby more conclusively evineing the purpose
of deserting her and leaving her to her own solitary re-
sources.   This was "abandonment," statutory as well as
actual.   And his subsequent return to his desolate, but
perhaps more quiet home, was no return to his wife, nor
invitation to her to follow his example, but was rather a
command to stay where his acts of desertion had virtu-
ally compelled her to go.   She was bound to presume
that he did not intend that she should go back to him and
that an attempt to do so would drive him off again.

The expressive and persevering course thus pursued by *Mr. Logan,* is fairly susceptible of no other consistent interpretation than that of determined and continued abandonment.

2. And although *Mr. Logan* may have acted conscientiously, under a firm conviction that the course he adopted was accordant with his wife's desire and necessary for his own health and tranquility, and even that there could be no hope of an amelioration of her feelings and conduct towards him—yet, nevertheless, unless in her excited moments, she had so acted towards him as to jeopard his personal security, the code of law which rules in this *forum* does not justify his abandoning his home and his wife "with a view to a permanent separation." Marriage, being more fundamental and important than any of the social relations, is controlled, as to its obligations, by a peculiar policy deemed essential to the permanent welfare of the whole social community. Being a contract for life, indissoluble by the consent of the parties merely, it should not be dissolved by the sovereign will for any other causes than such as are subversive of its essential ends or inconsistent with the general welfare. And it is certainly important to the general stability and harmony of that relation, that the parties should know, that, having taken each other with all their infirmities, and vowed reciprocal fidelity and forbearance for life, it is their interest, as well as their duty, to "bear and forbear" as far as the resources of love, phylosophy, and religion can enable them. And this, to an essential, if not to the whole extent, is the law of the land—which will not countenance or permit separation from bed and board for incompatibility or austerity of temper, alienation of affection, domestic discord, or reproachful words, however vulgar, or violent, or undeserved, but requires, by the strongest of all temporal sanctions, that all difficulties resulting from such avoidable causes shall be either adjusted in the domestic *forum* or borne with patience, as contingent incidents of the union the parties had mutually promised to cement by love and adorn by grace for life. Parties so unfortunately united in the most sacred and endearing of all earthly relations, must submit to the

misfortune as one of the consequences of an injudicious choice. They must strive to conciliate by kindness and forbearance—"must subdue by decent resistance or pru-"dent conciliation; and if this cannot be done, both "must suffer in silence." This is our law, human and divine; "and if it be complained that, by this inactivity "of the Courts, much injustice may be suffered and much "misery produced, the answer is, that Courts of Justice "do not pretend to furnish cures for all the miseries of "life. They cannot make men virtuous, and, as the hap-"piness of the world depends on its virtue, there may be "much unhappiness in it which human laws cannot un-"dertake to remove."

The law prudently determines that even the most offensive ebullitions of passion, in words or acts, which neither injure the person nor endanger personal security, will not authorize a divorce *a mensa et thoro*. There must be *sævitia* to justify such a seperation. Less severity than this will not authorize a Court in this State to "put asunder" those whom "*God* hath joined together." And were it otherwise, domestic quarrels might mischievously engross all the services of Courts of Justice: *Evans* vs *Evans*, 1 *Hagg. Cons. R.* 39–40; *Harris* vs *Harris*, 2 *Ib.* 154; *Waring* vs *Waring*, 2 *Phill.* 132.

Had *Mr. Logan* then resorted to the law for relief, instead of attempting to relieve himself by deserting his wife, his petition would have been dismissed, because the *scolding* of which he complains was not "*cruelty*," in the legal sense, and would not, therefore, have justified a separation. And it is clear that acts or words which would not authorize a separation by decree, could not furnish a *legal* excuse for voluntary abandonment. The same principle of policy and rule of law apply with equal effect to the personal and the judicial remedy.

—And unless the conduct be such as to justify a divorce, it will *not* justify abandonment.

In judgment of law, therefore, his abandonment was without sufficient cause; and, of course, his wife's right to conjugal restitution or to alimony, cannot be barred by conduct which did not furnish him with *legal* cause for separation: 1 *Hagg. Cons. R.* 361; *Ib.* 455; *Holmes* vs *Holmes*, 2 *Lee.* 116: *Bartlee* vs *Bartlee*, 1 *Adams*, 305.

When he left his home, therefore, that decisive step was miscounselled, however pure may have been his purpose or cogent his reason in the *forum* of his conscience or his *ethics*.

Though an original bill for alimony and divorce may be prematurely filed, yet if grounds for alimony occurs before the hearing, and the facts are set out in amended bill, and not answered, the Court may give the appropriate decree for complainant.

3. The fact agreed on the record, at the hearing of this cause, had been alleged in an amended bill filed after the abandonment had been continued for a year, and had not been denied. The original bill did not suggest the abandonment as a ground of the relief sought therein, but only as an aggravation of other grounds which were not established, and which, had they been sustained, would have been insufficient.

The style of that bill was exasperating and its tone extremely denunciatory. When it was filed there was no legal ground for such a suit. It does not intimate either that *Mrs. Logan* was willing to return to the embraces of her husband, or that he would reject her. Had she not thus imprudently denounced and attempted to degrade him, they might, perhaps, have been now cohabiting in renewed peace and harmony, as creditable to each of them as their obstinate and strange disruption may now and hereafter, be injurious to the character and happiness of both.

Do these considerations present sufficient ground for dismissing her bill? We think not.

The agreement on record, and the failure to answer the amended bill, virtually admitted continued abandonment for one year. Mr. Logan, at that time, manifested no change of purpose. Had he then made a satisfactory offer of reconciliation and it had been rejected without sufficient cause, the bill ought to have been instantly dismissed. Had she made the like offer and it had been improperly rejected, she might have been entitled to one third of the annual profits of his estate. But as neither of them made any such overture, we must consider the case as one of admitted abandonment for a year. And though her equity is impaired by her premature bill, it should not be thereby destroyed or postponed. If, because it might be possible that, by filing it, she had prevented a reconciliation, this Court ought to direct a dismission without prejudice, as urged in argument—the

LOGAN
vs
LOGAN.

same reason might apply, with equal effect to a new bill; for an amended bill, filed more than a year after the first act of abandonment, could have placed *Mr. Logan* in no worse condition as to an available defence, than that in which an original bill, thereafter filed, would have found him.

We are, therefore, disposed to concur with our predecessors, who, in the case of *Butler* vs *Butler, supra,* intimated the opinion that, though a bill shall have been filed prematurely for alimony, an amendment after legal cause existed, might be availing. And there can be no doubt that the denunciations in *Mrs. Logan's* bill constituted no legal excuse for the continued abandonment.

4. By the anti-nuptial contract, which, in our opinion, is neither void nor voidable, upon the facts as now exhibited, each party renounced all right to the property of the other, which might otherwise have resulted, by operation of law, from their marriage. It might be as unjust, as it is unreasonable, to infer that the parties contemplated and intended to provide for a separation. The contract applies only to marital rights. It did not absolve the husband from his legal obligation to maintain his wife during cohabitation—nor, for the same reason, can it exonerate him from contributing to her maintenance after deserting her, unless her own estate be amply sufficient.

That agreement, therefore, may present no insuperable barrier to decreeing alimony.

An anti-nuptial contract, in which each party renounces all right to the property of the other, which would accrue by operation of law, upon the marriage, presents no bar to a decree for alimony, on a proper case being made out. The husband is not thereby absolved from his legal obligation to maintain his wife.

5. However strongly Mr. Logan may have been provoked to the course he adopted, in judgment of law, his abandonment was without sufficient cause, and *Mrs. Logan* is still his wife. He must, therefore, be under a legal obligation to maintain her, if her own separate estate be insufficient.

Upon an investigation as to *"faculties,"* his income may be estimated at about $2,500, and her's at $250.

Under all the circumstances, as exhibited in the record, we concur with the Circuit Judge in the opinion that *Mr. Logan* should not be required to contribute to his wife's maintenance if her own means be ample, and that, if he be liable to any contribution, the established principles of equity and of public policy will entitle her

In such case the allowance for alimony should be only so much in addition to the wife's own resources, as will maintain her in decency and comfort during the separation.

LOGAN
*vs*
LOGAN.

to only so much, in addition to her own resources, as may be barely enough to maintain her, during separation, in decency and comfort.

But here we meet the most vexatious difficulty which we have had to encounter in this vexing case; and, as to the amount to be allowed, we have differed in opinion.

But we have finally agreed that Mr. Logan ought to contribute *something*, and that $300 *per annum* is as much as should be exacted from him at present. This is apparently enough to supply any deficit that could probably occur in her own means applied, as we all think they should be, by appropriating not only the income but some portion of the capital, so as not prematurely or greatly to exhaust it. And therefore, the final conclusion is that an annual contribution of an additional $300 by *Mr. Logan* should *prima facie*, be deemed sufficient for securing the comfortable and prudent maintenance of a solitary and aged christian woman, accustomed to live in as respectable society as any in the Commonwealth.

In cases of decrees for alimony, the Court should retain the case for the purpose of enlarging or curtailing the allowance, as circumstances may warrant, and for keeping open the door of reconciliation.

If hereafter, the Circuit Judge shall be satisfied that this allowance is either inadequate or superfluous, he will, of course, modify it by enlargement, curtailment, or suspension altogether, according to circumstances, retaining, as he must, the control of the case for that purpose, and for the benevolent purpose also, of keeping open the door of ultimate reconciliation.

And though it was not the lot of these venerable parties to climb the hill of life together, yet, having united their destinies on its declining steep there *can* be no good reason why they may not totter down it hand in hand, and sleep together at its base.

Decree reversed and the cause remanded.

*Owsley, Turner, Robinson & Johnson* for appellant; *Combs* for appellee.