## Early & Daniel Company v. C. S. Evans & Company.

(Decided May 31, 1921.)

### Appeal from Jessamine Circuit Court.

Evidence—Sufficiency—Contracts—Breach—Action for Damages.
—In an action for damages for breach of a contract for the sale
of wheat, evidence considered and held that the verdict on cer-
tain issues submitted to the jury was flagrantly against the evi-
dence.

JOHN A. WELCH & HUNT, BENNETT & UTTER for appellant.

BRONAUGH & BRONAUGH for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

On October 24, 1915, the Early & Daniel Company of
Cincinnati, Ohio, purchased of C. S. Evans & Company
of Nicholasville, Ky., 8,000 bushels of No. 2 red winter
wheat at $1.59 per bushel f. o. b. Nicholasville Ky., for
shipment to Newport News, Va., "subject to Newport
News weights and inspection." On May 4th or 5th C. S.
Evans & Company shipped eight carloads of wheat to
Newport News. Bills of lading with drafts attached
were sent to the Early & Daniel Company and the drafts
paid. Upon the arrival of the cars in Newport News,
four were accepted and four were rejected on account of
garlic, and the Early & Daniel Company were notified
of the rejection by wire dated and received May 14th.
On the same day the Early & Daniel Company sent to C.
S. Evans & Company a copy of the telegram and enclosed
it in a letter containing the following: "Will advise fur-
ther as soon as get more particulars." On the same day
the Early & Daniel Company sent the following tele-
gram to J. H. Graves, manager, C. & O. Elevator, New-
port News: "Advise, if you can, what usual manner of
handling rejected garlic wheat also send samples of cars
(names of cars omitted) deliver grain growers enough
our two wheat to take place of these cars and handle the
rejected wheat for us."

On May 18th, the Early & Daniel Company wrote to
C. S. Evans & Company that they had had no definite in-
formation from the C. & O. Elevator as to the manner in
which the rejected cars could be handled, and saying,
"However we are afraid that these cars will not do for

export.'' On May 19, 1915, the Early & Daniel Company wrote C. S. Evans & Company, advising them that the exporters would not accept the garlic wheat, saying: ''Under the circumstances, we cannot use the wheat at any discount. All we can see for you to do is to make a sale to a Virginia mill. If you want us to assist you in this matter, we will do all we can. Have instructed the elevator at News to send us an elevator receipt and upon receipt of same, will draw on you for amount of drafts paid.''

On May 24th, the Early & Daniel Company again wrote C. S. Evans & Company that they had been advised that the wheat could not be mixed for export, and adding: ''Now, gentlemen, under the circumstances, we cannot accept this wheat on contract. Will be compelled to draw back on you with elevator receipts attached just as soon as they arrive. However, if you want us to help you dispose of this wheat, we will gladly do so without any cost to you, or that is, any charge for our services.''

On May 25th, C. S. Evans & Company wrote the Early & Daniel Company acknowledging the receipt of the letter of May 24th, and adding: ''We also note you say you cannot use this wheat on contract. We do not understand this part of your letter, as any wheat sold, even though it does not grade, should be applied on contract at grade difference, as the writer explained to you when in your office a few days ago.''

On May 26th, the Early & Daniel Company wrote C. S. Evans & Company as follows:

''Had the wheat been shipped to Cincinnati or any terminal market, your position of taking it at the market difference would probably be correct. But in this instance, you sold us a specific grade of wheat for export, and have shipped a wheat which cannot be blown or cleaned or mixed in with other stock and be brought up to No. 2 grade. We do not object to your corresponding with Mr. Graves, and have written him to give you all the information or assistance he can. Just as soon as you have had reply from him, will thank you to get in touch with us. Would suggest that you act quickly, as the wheat is there now subject to your order.''

On June 2nd, the Early & Daniel Company wrote to C. S. Evans & Company that they had not received elevator receipts on the four cars of rejected wheat, and adding: ''If you care to make disposition in the mean-

time, advise us and we can arrange it. If we can be of any assistance in disposing of this wheat, call on us." On June 7th, C. T. Ashley, a member of the firm of C. S. Evans & Company, went to Newport News to look after the wheat. He called on Mr. Graves, the manager of the C. & O. elevator, and was referred by him to Mr. Scheer, the chief inspector. Scheer assured him that the wheat would grade as No. 2 wheat, which was satisfactory. Upon Ashley's return from Newport News, the Early & Daniel Company sent the following telegram to C. S. Evans & Company:

"Newport News Elevator wires today that loading orders have been received enabling them to mix out the Garlic wheat advantage of this should be taken now to save further loss. Therefore we will sell to best advantage today. Responsibility for the loss to rest with you or the C. & O. R. R. Company."                •

However, the telegram, when received by C. S. Evans & Company, read as follows: "Therefore, we will sell to best advantage today's responsibility for the railroad company." On the same day, the Early & Daniel Company wrote C. S. Evans & Company as follows:

"In reference to our wire today. · We received a wire from A. H. Graves, Mgr., C. & O. Elevator, Newport News, advising that at this time he could mix your wheat out and get a grade of No. 2.

"We wired you that we would sell wheat in stock at further loss which we did at $1.23 f. o. b. vessel Newport News today.

"Now, gentlemen, we cannot account for Graves' changing his grade at this late date. We, of course, are going to stand by the original grade. We had advice from Graves at that time that the wheat would not grade at No. 2 for export and could not be cleaned or blowed and brought up to No. 2 grade by mixing in with other stock we had on hand there at that time.

"We were within our rights in refusing this wheat from you on Graves' advice that the wheat would not do for export, and we cannot accept it at this late date only at the market difference.

"As soon as we get the matter straightened out, that is, the deal finally put through, we will render bill against you for loss and if you have any claim, it is against the C. & O., as we cannot and do not intend to stand in between on this transaction.

"Trust we have made ourselves clear and undoubtedly our action in selling the wheat at News was satisfactory to you as we did not get reply."

In addition to identifying the various letters and telegrams, E. B. Terrill, representing the Early & Daniel Company, testified in substance as follows: The purchase of the wheat was made over the telephone and then confirmed by a letter from C. S. Evans & Company. The wheat was purchased for export and Evans & Company were informed of this fact. The first communication which he received from Evans & Company was the letter of May 25th. The wheat was sold on June 15th at the price of $1.23, which was the market price at Newport News at that time. He never received any authority from Evans & Company to sell the wheat. J. H. Graves, the general agent of the C. & O. Railroad at Newport News, identified the correspondence which passed between him and the Early & Daniel Company. A representative of Evans & Company called to see him in regard to the four cars of rejected wheat, and was sent by him to H. M. Scheer, the inspector for the Newport News Chamber of Commerce. Scheer testified to the rejection of the wheat and to the fact that sometimes wheat which is rejected on account of garlic is mixed out in shipments where certificates do not require, "Free from garlic."

For the defendants C. T. Ashley, a member of the firm, testified that he made the sale over the telephone to Mr. Terrill. He did not admit to the Early & Daniel Company that the wheat was not up to contract. Rejected wheat did not apply on contract in any market. The Early & Daniel Company did not notify him that they would handle the wheat for his account. After receiving several letters and telegrams from the Early & Daniel Company, he went to Newport News. He saw Mr. Graves and was referred to his chief clerk. He called him the inspector. He told Mr. Scheer that he came there to handle the wheat himself. Scheer said that he was going to take it and grade it as No. 2 wheat. This was satisfactory to him. On cross-examination he stated that he was in Newport News on the 7th. He did not call up the Early & Daniel Company to let them know what had been done with the wheat. It was their understanding that the wheat was for export, and the cars were all billed for export. He supposed that where wheat was shipped for export and was not up to proper

grade, it would be the shipper's wheat. He did not at any time offer to take back the wheat or repay the Early & Daniel Company. He simply let the wheat alone except for the conversation and correspondence he had with Mr. Terrill. All along, the Early & Daniel Company were trying to work it in with some other wheat they had. He did not think that he had letters showing that it was for his account. No matter what the wheat weighed or how it graded, the inspection at Newport News was to control. He did not know what became of the wheat.

The suit was brought to recover $2,034.87, loss on the wheat, $10.60 for shortage in weight and $30.24 for failure to load the cars to their full capacity. A trial before a jury resulted in a verdict and judgment for defendant. Plaintiff appeals.

It is conceded that the evidence respecting the item of $30.24, for failure to load the cars to their full capacity, was sufficient to make a question for the jury, but insisted that the verdict on the item of $2,034.87, loss on the wheat, and $10.60, for shortage in weight, is flagrantly against the evidence.

In addition to believing from the evidence that the contract was made and the wheat paid for, the jury, before finding for the plaintiff, were required by instruction No. 1 to believe from the evidence (1) that the four carloads of wheat were rejected at Newport News, (2) that plaintiff within a reasonable time thereafter notified the defendant of the rejection and refused to accept the rejected wheat, (3) that the defendant refused and failed to take charge of said wheat after receiving said notice of refusal to accept, (4) that by reason of such failure plaintiff became liable for storage or other charges, (5) that plaintiff notified defendant that it would sell said wheat, and (6) that plaintiff did sell said wheat on the open market for a fair and reasonable price. By instruction No. 2 the jury were told to find for the defendant if they believed from the evidence that after the wheat was rejected by the inspector at Newport News, the plaintiff took charge of said wheat on its own account and kept and sold the wheat as its own.

Taking up the evidence with reference to the issue submitted in the foregoing instructions, the testimony of H. M. Scheer, the chief inspector at Newport News, and the letters and telegrams from J. H. Graves established

beyond any controversy the fact that the wheat in question was rejected. A copy of the telegram notifying the Early & Daniel Company of the rejection of the wheat was mailed on May 14th, the day of its receipt, to Evans & Company, and therefore it cannot be doubted that Evans & Company were advised of the rejection of the wheat. But the words, "Handle the rejected wheat for us," in the telegram from the Early & Daniel Company to J. H. Graves, are seized upon to show that the Early & Daniel Company did not refuse to accept the wheat. In our opinion these words are of no probative force when considered in the light of all the letters and telegrams which passed between the parties. Not only were Evans & Company notified of the rejection of the wheat by the inspector at Newport News on May 14th, but on May 18th, which was within a reasonable time, Evans & Company were notified that the Early & Daniel Company could not use the wheat at any discount and would draw on Evans & Company for amount of drafts paid. This was a clear and express notice that the Early & Daniel Company could not use the wheat and would hold Evans & Company responsible for the price. Not only so, but on May 24th, Evans & Company were again notified that the Early & Daniel Company could not accept the wheat on the contract, and that the company would be compelled to draw back on them with elevator receipts attached just as soon as they arrived. Mr. Ashley not only admitted the receipts of these various letters and telegrams, but also admitted that the rejected wheat would not apply on contract in any market, and that the grading in Newport News was final, even though the weight and grade were erroneous. While the correspondence was going on, Evans & Company showed no disposition to protect the Early & Daniel Company in the transaction. Although Evans & Company were notified by various letters and telegrams that the Early & Daniel Company had refused to accept the wheat, Evans & Company never at any time notified the Early & Daniel Company that they would take charge of the wheat. It is true that Ashley went to Newport News. All that he did was to inquire about the wheat, and when informed that it would then be graded out as No. 2 wheat, he said that was satisfactory to him. He did not then oppose the arrangement or ask that the wheat be delivered to him.

On the contrary he acquiesced in the arrangement. That being true, all the circumstances show that he failed and refused to take charge of the wheat, and even his own testimony does not tend to establish the contrary. There is no dispute as to the items of storage and other charges for which the Early & Daniel Company became liable, and there can be no doubt that this liability arose from the failure of Evans & Company to take charge of the wheat. The Early & Daniel Company telegraphed Evans & Company on June 14th, that they would sell the wheat that day to the best advantage. "Responsibility for loss to rest with you or C. & O. R. R. Co." The testimony for Evans & Company is to the effect that the telegram when received read, "Responsibility for the railroad company." But, however this may be, Evans & Company do not deny receiving the letter written by the Early & Daniel Company on the same day, advising Evans & Company that the wheat was sold at $1.23, and that as soon as the mater was straightened out, they would render a bill against Evans & Company for the loss, and if Evans & Company had any claims, it was against the C. & O. railroad. It is undisputed that the wheat was sold. Terrill testifies that $1.23 was the market price at Newport News on the day of the sale, and defendant did not attempt to show the contrary.

While an occasional expression in one of the letters or telegrams affords a very unsubstantial basis for an argument to the contrary, the letters and telegrams construed as a whole, and viewed in the light of the conduct of the parties, show unmistakably that the Early & Daniel Company in selling the wheat was acting for Evans & Company, and did not sell the wheat as its own.

In our opinion there is no escape from the conclusion that the verdict of the jury on the issues submitted by instructions Nos. 1 and 2 is flagrantly against the evidence. The same is true with respect to the item of $10.60 for shortage in weight. The shortage was proved and there is no evidence to the contrary.

Judgment reversed and cause remanded for new trial consistent with this opinion.