## Sales v. Sales.

(Decided December 2, 1927.)

Appeal from Jefferson Circuit Court
(Chancery Branch, Second Division).

1. Divorce.—Wife's cruelty to husband held not proper ground for divorce by husband.
2. Divorce.—In suit for divorce from bed and board by wife on grounds of cruelty, evidence was held sufficient to show cruelty of wife justifying husband in leaving her.
3. Divorce.—Where husband, when sued for divorce from bed and board, asserted abandonment in that wife by her cruelty forced him to leave her, constituting constructive abandonment, relief was properly refused as granting husband divorce for cruelty of wife contrary to law.
4. Divorce.—In suit for divorce from bed and board by wife on grounds of cruelty, where husband counterclamed alleging cruelty and abandonment, and evidence showed cruelty of wife, grant of alimony to wife held error since her conduct deprived her of all right to alimony.

PETER, LEE, TABB & KRIEGER for appellant.

BEN F. EWING for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Reversing in part and affirming in part.

On October 6, 1926, Rosalind H. Sales sued her husband, Grover G. Sales, for divorce from bed and board, alleging cruelty, and that on January 3, 1926, he had abandoned her. By answer and counterclaim he denied her allegations of cruelty and charged her with cruelty to him, wherefore he asked for divorce from bed and board. On December 29, 1926, the court gave to each a divorce from bed and board, and awarded her the custody of the children and an allowance of $265 per month

alimony. On January 17, 1927, the husband amended his answer and counterclaim and alleged that the abandonment of January 3, 1926, was brought about by the conduct of Mrs. Sales, that such conduct and resulting abandonment had continued since then; and he sought an absolute divorce from her on the ground of abandonment. On March 19, 1927, the court dismissed his counterclaim, and, from that judgment and the former judgment allowing Mrs. Sales $265 per month alimony, he has prosecuted this appeal.

These parties were married on April 14, 1913. Their ages do not appear in the record, but they met while Grover G. Sales was a student at Harvard, and were married in less than two years after his graduation, from which we infer they were both young people of near the same age. They are both members of the Jewish race and of that religious belief. Both are well educated. The husband is a lawyer, and the wife has studied law and contemplated taking up the practice of that profession. So we find them embarking on their married life with every prospect of success and happiness. Happiness failed to follow. They have lived a tempestuous life, and this is the eighth time they have separated. The trial court found and we find that the wreck of this marriage resulted from certain traits of character on the part of Mrs. Sales, and that she was at fault. She felt that she was made of a trifle better clay than he; that she had married beneath herself; and that she was better than her husband's family, and said so in her testimony. She felt that she was more intelligent than he, and frequently told him of these things. He testified that she was constantly berating him and abusing his family; that she called his mother the vilest of names and accused her of running a disorderly house; that when she attended the funeral of Mr. Sales' father, she was so infuriated by the eulogy pronounced that she said the Rabbi ought to be run out of the temple. She told Mr. Sales that he would never be any good; that a silk purse cannot be made out of a sow's ear, and made other remarks of that ilk. She was of a jealous disposition, and of such Shakespeare says in Othello, act 3, scene 3:

> "Trifles, light as air,
> "Are to the jealous confirmations strong
> "As proofs of holy writ."

Mr. Sales testified that his wife kept him under constant espionage. If some woman client telephoned him, she would accuse him of something wrong. If he left home to go any place, she would telephone to see if he was there. If he went to the drug store and stayed over ten minutes she would accuse him of going some other place. If he was seen with a woman on the streets, she would accuse him of the most awful things. In her saner moments, when friends talked with her about what she was doing, she would admit there was no truth in these accusations. She would say it was just her disposition, and promise to amend, but when next she was aroused, she would reiterate and reaffirm it all. He gave his stenographer a Christmas gift, and they had trouble over that. She made him give an account of every place he went. The suspicion of relations with other women she kept over him all the time. She accused him before his children. She nagged him on this subject all the time. He lived in constant dread. There are in this record letters written by her in which she refers to him as a "jackass" and other such terms. As counsel for one of the departments of the government of the city of Louisville, it became his duty to take steps to close a certain show because of its salacious character, and he did so. About that time he missed a diamond pin, and for two months she accused him of giving it to one of the girls on the stage, until the pin was found in the home. In her tantrums she would threaten to commit suicide, and she staged some scenes in which she pretended to have taken something, and the neighbors were called in. Mr. Sales has only one brother, and if he went to his brother's home, she would accuse him of going to see his brother's wife. Mrs. Sales did not speak to Mr. Sales' mother or his brother, his brother's wife, or to his niece, and so testified, and added that none of them could come into her home. She refused to speak to his friends and to neighbors who treated him courteously. She would go to her husband's office, and go through his files. She would station herself there, and give directions to the stenographers that she would answer the telephone, and she would do so. She so conducted herself that one of Mr. Sales' stenographers left his employment. She would follow him about to see where he went and what he did. There is no need of going further into the evidence.

This clearly shows who is to blame. In her evidence, Mrs. Sales admits the truth of most of her husband's testimony. Other parts of it she denies, but denies it in such a way that her denial is not impressive, and her husband's testimony is so supported by other witnesses in the case as to make it credible. Mrs. Sales says that her husband was irritable and nervous. A man kept in terror as he was, could not be otherwise. His home was to him a place of dread and terror, instead of rest and repose, and the close of his day's work meant the renewal of the conflict. Jealousy is a strange thing. It has caused more human wretchedness than all the wars, pestilences, and other disasters the world has known. In all the annals of recorded time, there is not one case in which one thing has been gained or one love preserved by yielding to the sin of jealousy, yet any lawyer, after just a few years' practice, can tell of instance after instance where he has had related to him experiences so similar that about the only change is the locus et personæ dramatis. Men have written descriptions of the horrors of war, the ruin wrought by pestilence, and the wretchedness of slaves, but no one has ever written on jealousy. Those who have experienced the wretchedness of life with a jealous spouse have found it beyond their power in language to describe, and, were some genius in words to picture such a woe, it would be beyond the powers of those who have not had that experience to understand. This is one phase of human misery that is and must forever remain to the initiate, utterly indescribable; to the uninitate, absolutely incomprehensible. Out of the abundance of his wisdom and the numerosity of his matrimonial experiences, Solomon was best prepared to speak on this subject. In six words he summed up and said it all, "Jealousy is cruel as the grave." Songs of Solomon, viii: 6. The conduct of Mrs. Sales toward her husband was cruelty beyond description. The bonds of marriage that bind one to such a spouse are veritable chains that are heavy, though they clank not, and gall forever.

Her cruelty was sufficient to justify him in leaving her, but cruelty by the wife is not a ground of divorce to the husband. We are asked to hold that, since her cruelty forced him to leave home, she is constructively guilty of having abandoned him. He relies on the cases of Carter v. Carter, 140 Ky. 228, 130 S. W. 1102, and

Johnson v. Johnson, 145 Ky. 488, 140 S. W. 656, and insists upon the authority of those two cases that his counterclaim for divorce on the ground of this constructive abandonment on her part is sustained by the evidence, and that he is entitled to and should be given an absolute divorce. If we did this, we would be doing indirectly what the law does not permit us to do directly—we would be divorcing a husband because of the cruelty of his wife. There are several cases in which the wife sued for either divorce or separate maintenance on the ground of abandonment, in which the husband defended on the ground that his wife's temper had justified him in leaving her. Logan v. Logan, 41 Ky. (2 B. Mon.) 142; Canine v. Canine, 16 S. W. 367, 13 Ky. Law Rep. 124; Evans v. Evans, 93 Ky. 510, 20 S. W. 605, 14 Ky. Law Rep. 628; Kelly v. Kelly, 183 Ky. 172, 209 S. W. 335. In each of these cases, the husband was denied the relief sought, and in the Canine case, this court said that nothing less than sævitia would justify the husband in leaving his wife. The same was said in the Logan case, supra. This expression, "sævitia" came to us from the ecclesiastical courts of England, and although the English ecclesiastical law was not adopted by the American colonies when they adopted the common law, yet we find many evidences of its influence, as the use of this word in these opinions indicates. In the case of Stepp v. Stepp, 178 Ky. 337, 198 S. W. 935, we said that what would be cruel and inhuman behavior, in one case, would not be such in another. The education, culture, and social position of the parties must be considered, and what would be only an indignity under some circumstances may be cruelty under others. Mrs. Sales was reared in Brookline, a suburb of Boston, and her language used in her testimony shows the influence of her early surroundings, and indicates that she is a person of culture. The testimony of her husband gives evidence of his training and education, so that no matter how harsh the term "sævitia" may have been, or what it may yet be held to mean, we have reached the conclusion that, while Mr. Sales was not entitled to an absolute divorce, still his wife's course and conduct was such as to justify his leaving her and deprive her of all right to alimony. We feel that our position is supported by the cases of Griffin v. Griffin, 47 Ky. (8 B. Mon.) 120, Smith v. Smith, 86 S. W. 678, 27 Ky. Law Rep. 776, and Ahrns v. Ahrns, 160 Ky. 342, 169 S. W. 720. We do not regard

this as a departure from previous holdings of this court or as a forward step, but if it is such we believe it is justified, and we are prepared to take it.

In the case of Phillips v. Phillips, 173 Ky. 608, 191 S. W. 482, we said:

> "Should the court conclude upon the hearing of the case that, although the grounds for an absolute divorce are not fully sustained, yet, if the interest of the parties, their infant children, and the good of society demand it, he might under the statutory power conferred in this jurisdiction, grant a divorce from bed and board."

The separation of these parties is already an accomplished fact, and in granting them a divorce from bed and board the trial court merely regulated a regulation which they themselves had already established.

Before concluding this opinion, we desire to make acknowledgment of the great assistance given this court by the very able and learned opinion prepared by the trial court. We have not been able to agree with it entirely, but have in the main found it sound and filled with learning.

The judgment denying to Grover G. Sales an absolute divorce is affirmed, but the judgment of December 29, 1926, is reversed in so far as it allowed Mrs. Sales any alimony. This record shows that Mr. Sales is ready, willing, and able to support his children, which, of course, he must do.

Whole court sitting.