# Trout v. Trout

Jan. 25, 1944.

W. Clarke Otte and James S. Shaw for appellant.

Bullitt & Middleton and Leo T. Wolford for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Reversing.

Appellant, plaintiff below, and appellee were married in Indiana in 1918. They have three daughters, two married, the third about eighteen years of age and self-supporting. They lived together in Indiana until 1939 when they moved to Louisville. It is gathered that their early married life was pleasant, but during latter years, and assuredly during the last five, it was not so, and for a year or more before separation they lived in the same home not as husband and wife.

In April 1942 appellant filed suit for divorce on grounds of cruel and inhuman treatment. KRS 403.020(d). Appellee answered by way of denial and in counterclaim, not seeking divorce, asked for an allowance of alimony. The master commissioner, by one of his deputies, heard the proof and recommended that the petition be dismissed and on counterclaim the wife should be paid $40 per month alimony. Exceptions to the report were overruled and judgment was entered accordingly.

On appeal the question presented is whether or not the proof adduced for appellant entitled him to a judgment of divorce. It is argued that the commissioner did not properly evaluate the testimony, and was mistaken in his application of the law, and that the chancellor,

perhaps relying upon the commissioner's report, fell into error. The report in some respects is of interest, particularly as to some philosophy of life expressed. He did not set out in his report any more than his conclusions reached from a hearing of the evidence, which he held was insufficient. He said that the proof that appellant was associating too much with "other women" did not constitute grounds for divorce, and (correctly) the law does not apply "where the wife speaks of the husband going around with other women."

The commissioner wrote: "The quarrels they had about his running around with other women were simply quarrels and did not indicate any accusation against him." Continuing the officer said: "To charge a woman of running around and being lewed is a very different thing than to charge a man with running around with women &c. The first charge is important and the second charge is of little importance as I see it. Most men would feel complimented by such accusation and think they were ladies' men. I think the wife was mistaken in her accusing her husband for a long period of time of associating with other women. * * * The defendant in this case does not claim to have seen any improper relations by her husband with other women."

It may be that the philosophy in respect of self-pride is sound, but not safe if reaching ears other than those of the Lothario, real or imaginary. In reaching some ears it creates jealousy which "sees things always with a magnifying glass, which makes things large, of dwarfs giants, of suspicions truth," and unless the passion be strangled at birth soon becomes strong enough to totally obliterate truth. This passion admittedly existed in the mind of the appellee; whether with proven justification is the question presented here.

The case like many we have had dealing with domestic relations, presents an unfortunate situation. We have two people whose demeanor, in so far as developed by the testimony in recounting relations, covering a part of a twenty year married life, show them to have been of more than average intelligence; both endeavoring to raise and educate their daughters in a commendable way. Both parties were at times active in religious and semi-religious work. The husband admits that the appellee was a good housekeeper, and handled all finances,

paying all housekeeping bills, and except for a few minor extravagances, in a business like manner.

Appellant for a greater part of the time was a solicitor and collecting agent of a life insurance company, working on commissions. At the time of his suit he was making from fifty to sixty dollars per week, which he says with the exception of small sums, he turned over to the wife regularly. The commissioner for some reason undertook, without great success, to confine the proof of the difficulties to the five years prior to the institution of the suit, but there is enough in the record to show estrangement prior to that period. The two lived in Terre Haute until moving to Louisville. Appellant first worked in a department store, later engaging in selling insurance and collecting his debits. Some time in 1928 the wife suggested separation and he declined for the reason above stated. After removal to Louisville the husband continued to work for the same insurance company. In April 1942 the situation reached such a stage that the husband, saying he could bear the treatment no longer, was transferred to the company's plant in Cleveland, Ohio.

Appellant testified for himself and offered a sister who was sometimes a visitor in the home. The wife offered no proof in an effort to refute the husband's charges or justify, except her own. The cruel treatment is based on the charge that the wife constantly nagged him about matters of which he insists he was entirely innocent. The wife admitting the jealousy contented that there were amply justifying grounds.

Appellant was actively interested in church work, and in Boy Scout activities. These, together with his insurance business, brought him in contact with many persons, both men and women. The wife accused him of using his church work as a subterfuge for the purpose of meeting young women. She said that he had built a cabin for the Scouts so as to have a place of meeting women. At one time when Mrs. Trout was ill they had an elderly woman serving as cook and maid; the wife raised objection because she and the husband talked in low tones in the kitchen. She explains her objection by saying that due to her nervous condition their voices disturbed her. The wife, as appellant says, would not allow her sister to visit the home because she thought appellant too attentive. The husband said his work some-

times kept him out as late as 11 or 12 o'clock at night, and on his return the wife would wrongfully accuse him of having been with other women. She would employ her olfactory nerves to see if she could detect the odor of powder or perfume; she accused him of washing his underwear to hide evidences of his having had to do with other woman. He said on rare occasions he did wash some underwear at times when he found none laundered. The thing which seemed to aggravate him most was the wife's charge that he was holding out of his pay checks. The wife conceived the notion that the envelopes turned over to her with indorsement of amounts of commission, had been changed. She communicated with the office and requested a showing of how much he had drawn for a given period. This resulted in a change in plans as to turning the money over to the wife, and perhaps widened the breach. He became very much incensed when the wife began to discuss family matters with his boss; this led to the separation and the transfer of appellant to Cleveland. One of the complaints which he said interfered with his peace of mind and his business, was the charge that when he retired the wife would keep him awake for hours repeating her accusations; this he characterized as "constant nagging."

The wife says that during the last three years of their married life he only turned over to her from twenty-six to thirty-two dollars each week, while he was making around $60 per week; she admits that she "mentioned" to him about being out late at night, and inquired where he had been, but had desisted for the last two years, during which she asked him normal questions "without accusations of infidelity or immorality." These matters occurred ostensibly during the period when the two were not living as man and wife. She said that she had discussed the "home life" with others, including his relatives, merely for the purpose of helping him. She said that she had never seen him commit an immoral act, or running around with other women, but that she had good reason to believe he had because she had received several letters (not produced) and anonymous telephone calls, one to the effect that "he was having an affair with a girl at our church, and one woman said he was going with a girl at the store where he worked." From the proof his work at the store was more than seven years prior to the separation.

Asked the direct question as to whether or not she was jealous, she said: "I don't know what you mean by the word. I think I have certain rights as a wife and when these rights are not lived up to—if you call that jealousy then I am jealous." She added that "every thing was based on facts, and she was positive in her mind that he had been guilty of immoral conduct with other women." The only facts she had beyond the money matters, were based entirely on letters, which according to her proof were anonymous. She apparently made no effort to verify any of these charges, or make attempt to tender proof which might have a tendency to justify her charges. She did at one point say that her friends and acquaintances had mentioned the fact that they had seen Mr. Trout "in company with other women." None of them was produced, and as we read the entire record, giving verity to the proof on both sides, we cannot escape the conclusion that appellee was and is unfortunately of such a jealous disposition that the passion asserted itself when she saw or heard of her husband in company with other women. Two instances fortify this conclusion, the one occurring at a banquet when she suspected that the husband desired to pay some attention to women associates in business. Another, when appellant went to the home of a neighbor to pay respects to the family of one member who had died; she watched through the window and saw him talking to a girl. Her idea was that he had spent too much time in this conversation, which he says was without guile.

It is unnecessary to go further into detail of proof which we have briefly recited. It is not difficult to reach the conclusion that insofar as the record shows, the charges here were figments; mostly based on the chatter of loose tongues with or without motive. We must say that we are impressed with the full and frank statements of appellant, though not discrediting the testimony of appellee.

The conclusion reached by the commissioner (carried into judgment by the chancellor) seems to be that while the proof offered by the husband might be sufficient, he was in doubt as to his authority to recommend a decree. The commissioner may have had in mind Sales v. Sales, 222 Ky. 175, 300 S. W. 354. However, since that opinion the law has been amended so as to extend to the husband the right to divorce on the

grounds here charged. Acts 1936, Ch. 25. Quite recently we had cases very similar in its aspects, in which we said that while mere fits of ill temper and occasional quarrels and scolding by the wife did not justify a husband in abandoning, unless his personal safety is in danger, but "continued acts of criticism, contempt and disrespect are sufficient to sustain a charge of cruel and inhuman treatment. Grove v. Grove, 239 Ky. 32, 39 S. W. (2d) 193." Hockensmith v. Hockensmith, 286 Ky. 448, 151 S. W. (2d) 37, 38; Hickman v. Hickman, 291 Ky. 688, 165 S. W. (2d) 356.

We are of the opinion that the commissioner did not correctly weigh the testimony and was wrong in his conclusion that he could not apply the law to the facts, and that the chancellor was in error in adopting his recommendations, hence the judgment is reversed with directions to set it aside and enter one granting appellant divorce, and dismissing appellee's counterclaim.