## Baker v. Baker.

May 24, 1946.

A. D. Hall for appellant.

No brief filed for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellant, Sylvia M. Baker, was the defendant below, and William H. Baker was the plaintiff below, and they will be referred to in this opinion as such.

The action is one seeking a divorce, filed by plaintiff in the Clay circuit court on March 27, 1942. The grounds for the relief sought, as stated in the petition, were and are that: "* * * before the time of their separation the defendant, without like, or any fault on the part of this plaintiff, abandoned the plaintiff and his bed and became cold and insulting toward the plaintiff, abusing him and calling him vile names and opprobrious epithets, and for more than six months before their separation continuously behaved toward this plaintiff in such a cruel and inhuman manner as to permanently destroy his peace of mind and happiness."

The defendant employed S. M. Ward, an attorney residing in Hazard, Kentucky, 80 miles distant from Manchester, Kentucky, where the action was instituted. He filed her answer and counterclaim, denying generally the grounds alleged in the petition, which was followed by a specific denial thereof. For counterclaim she alleged that she had no desire of remarrying, and did not desire any divorce from plaintiff; that up until about two years prior to the filing of the answer she and the plaintiff lived together as husband and wife; that she had treated him kindly and in an affectionate manner, and endeavored to perform her duties as a wife, but that "the

plaintiff, without fault or like fault upon her part has for more than one year next before the institution of this action, wilfully and wrongfully deserted and abandoned her and attempted to put her away as his wife and they have not lived or cohabited together at any time since that date.''

She further alleged that within five years before the institution of the action, and without like fault on her part, plaintiff had been guilty of such cruel beating and injuring her and of attempts to injure her as to indicate an outrageous temper in him and probable danger to her life and great bodily harm from her remaining with him, but that ''she has such a regard for the marital obligations entered into that she does not feel it to be fit or probable that a divorce should be granted to the defendant.'' However, she asked that if the court should grant any separation relief to plaintiff that it be only a judgment of divorce a mensa et thoro, and not an absolute one. She then asked for an allowance of alimony for herself and the custody of their child, who was then nine years of age, and for an appropriate allowance for his maintenance. Plaintiff's reply was a general denial of ''all of the affirmative allegations of the answer and counterclaim.'' After the pleadings were thus made up plaintiff gave notice to defendant's counsel that he would take depositions in his behalf at the office of his attorney in Manchester, but it was not executed on defendant, and her attorney resided 80 miles distant from the court in which the action was pending, although it appeared from the record that at that time defendant was staying with her parents who resided in Clay County, some eight or nine miles from Manchester.

The attorney attended the taking of the depositions pursuant to the notice, at which time plaintiff gave his deposition and took that of only one additional witness. Defendant neither gave her deposition nor took that of any witness in her behalf. It is stated in brief of counsel, appearing in her behalf on this appeal, that her employed attorney, S. M. Ward, for some cause, abandoned the case after plaintiff finished taking his proof. In that condition of the record the cause was submitted, and the court granted to plaintiff an absolute divorce from defendant, denied her any alimony and gave the custody of the nine-year-old child of the parties to plaintiff. From the judgment denying alimony, and giving the custody of

the child to the plaintiff, defendant prosecutes this appeal by and through a newly employed counsel in lieu of her original one.

It is provided by statute in this jurisdiction, KRS 21.060, that this court may not reverse a judgment of absolute divorce where the court so decreeing had jurisdiction of both the subject matter and of the parties, and we have held in cases too numerous to require a listing of them that where the testimony is sufficient to sustain the ground relied on by a husband, seeking a divorce from his wife for cruelty or abandonment (the ones relied on in this case) and the husband was without fault, then no alimony would be allowed to the wife because she was the one exclusively at fault. On the contrary, our decisions have been equally unanimous in holding that where the grounds mentioned were not proven by sufficient evidence, but the trial court nevertheless granted the divorce to the husband, the wife is entitled to alimony and to such other relief to which she might be entitled, but not to a reversal of the divorce judgment. Such being the condition of the law we will examine the plaintiff's testimony as given by himself, the testimony of his additional witness being of but little, if any, materiality or tending to establish the ground relied on by him.

The plaintiff in his deposition testified on being asked the condition of his wife's health that "she complained a good deal"; that she enjoyed dancing and desired to attend dances in the community and insisted on his going with her, but he refused, which irritated her and, as he stated, caused her on one occasion to make a more or less prolonged visit to her parents who resided, as we have stated, in the country some distance from Manchester.

Plaintiff was cashier of the First National Bank of Manchester, and at the time of the separation he owned, in addition to other property, a body of land containing 240 acres, 100 acres of which was a mineable seam of coal, and he had leased the right to mine it to an operating company with an agreed royalty to be paid to him of 10 cents per ton. He testified that on occasions he would return to his home at meal time when his wife would be in bed and had made no attempt to prepare a meal, but he did not state that at such times she was physically well and able to do so. He furthermore stated that the

prolonged stay of his wife with her parents at their home—caused, as he stated, by his failure to attend dances with her and other social gatherings that she desired to attend—was ten years prior to the separation, and that she was received by him upon her return and their relations as husband and wife continued as such thereafter until the separation. He stated—by way of conclusion only—that he treated her kindly and that she "treated him unkindly," but no concrete facts proving such conclusion statements were given.

At the time of that quarrel (which the husband claimed was the cause of her prolonged stay with her parents) he testified that "I made her think she was going to have to stop quarreling at me", but he failed to state how and by what means he employed to make her so think, whether cruel or amicable. He also testified that at the time of their separation (10 years later) and as the immediate cause thereof, that he and his wife had gone to the home of her parents to spend the week-end, "since our child, Billy, stayed down there approximately half of the time", and that he desired to return home on Sunday evening, to which suggestion she replied that he might return home and that she and her son would spend another night with her parents, with the understanding that he return for them on the following Monday evening, which he did. But she again insisted on protracting her visit, to which he agreed, and he remained at the home of her parents that night. The next morning (Tuesday), as he testified, his wife said to him that she wanted to spend that day with her parents and that he could return for her and the child that evening.

He then narrated a controversy between him and his wife about her failing to return home, and protracting her visit to her parents, during which his wife, upon being reprimanded by her paralyzed father, in some manner not shown, got into a very heated quarrel with her father in which she used very unbecoming language toward him. However, plaintiff did not testify as to what her father had said or done to provoke such conduct on the part of defendant. Her language, if employed by her, was very unbecoming on the part of a child to his or her parent. But however that may be, her conduct on that occasion was not directed toward plaintiff, but only to her father.

The result was that the husband finally returned

home with his son and within a week thereafter, as he stated, ''my wife came up and was in our apartment when I came home from work''. He then stated that ''I told her that we were through and would not be living there any more'', and that ''I would take her home to Burning Springs, which I did.'' He then testified that some two or three weeks afterwards he came home and found her in the apartment and that he told her, ''That we were not living there any more and that she could take whatever furniture and household equipment she wanted and do what she wished with it,'' but that he desired to retain the Frigidaire, the vacuum cleaner and the radio, and that he then took her back to her parents at their home. He then testified that he neither saw nor heard from her for about three weeks thereafter when he returned home and ''found her on the walk below the apartment'', when he asked her if she had come after her furniture, to which she gave a negative answer. He then expressed his desire that she would take the furniture that he had agreed that she might have and then ''told her that she would have to find some other way of getting back to Burning Springs'', as he was not going to take her. He then stated that he left her and that she thereafter stayed at Burning Springs for something like a month or more when she returned for the furniture.

The unerring implication from plaintiff's testimony, as so substantially rehearsed, falls far short of establishing his grounds relied on in his petition. It shows plaintiff to possess an apathetic, cold and unaffectionate disposition, insisting upon strict performance of what he conceived to be the obligations of a wife in the performance of her household duties, thus indicating that he regarded a wife as a servant and without making allowance for her failures in such respects on account of her health or other legal excuses.

The marital relation is a sacred one and is the cornerstone of all civilized society. The duty of a husband in assuming such relationship in accordance with the vows taken by him at the marriage altar, is far more than to furnish shelter, food and raiment to his wife. He agreed on that solemn occasion to love, respect and comfort his companion in sickness and in health until death should part them.

Nothing is more calculated to destroy the happiness

of a wife than to have her husband assume and practice an indifferent course of conduct toward her clearly indicating a want of affection or an abiding interest for her welfare. Such an assumed attitude is a clear violation of the husband's marital vows. The text of 17 A. J. 179, section 56, states the approved rule as to what constitutes cruelty or abandonment as grounds for divorce. It says: "It is universally recognized, at least theoretically, that parties cannot be divorced on the ground of cruelty merely because they live unhappily together from unruly tempers or marital wranglings. Married persons must submit to the ordinary consequences of human infirmities and of unwise mating, and the misconduct which will be ground for a divorce as constituting cruelty must be serious. Mere austerity of temper, petulance of manners, rudeness of language, or even occasional sallies of passion, if they do not threaten bodily harm or impairment of health, do not as a general rule amount to cruelty. As has well been said, the husband and wife are bound to exercise greater efforts for removing misapprehension, allaying quarrels, smoothing the road to concord, and effecting reconciliation than are people in other relations of life. The marriage status is not merely contractual so as to entitle each of the parties to demand the strict letter of the bond. It is a status wherein the law operates upon the weakness as well as the strength of human nature, and it will not be dissolved except for grave and substantial causes. In short, it is not the policy of the law to grant divorces for postnuptial causes short of marital infidelity, when such causes do not in fact render one of the parties incapable of performing the duties incident to the marriage status. The law authorizes the severance of the matrimonial union only when the conduct of one of the parties renders it impracticable for the other further to perform the marital duties."

We, in a number of cases, have approved and adopted the substance of that text which is the same as that of all textwriters upon the subject. Some of our cases are: McKee v. McKee, 191 Ky. 669, 231 S. W. 213; Bone v. Bone, 200 Ky. 736, 255 S. W. 530, and Trout v. Trout, 296 Ky. 843, 177 S. W. 2d 864. They and others following them require clear and convincing proof of the grounds relied on before an absolute divorce be granted, and in each case it was emphasized that it must be made

to appear that the complaining spouse is without "like fault". We said in all of them that mere fits of temper on the part of the accused spouse will not alone be sufficient to sever the marital relation, unless it is of such a nature and character as to render it impossible for the parties to live together in peace and happiness. As an illustration of the position taken by this court, we take this excerpt from the opinion in the McKee case (191 Ky. 699, 231 S. W. 215): "The high temper of plaintiff was an unfortunate fact, but it was one that defendant should have taken into consideration in his treatment of and his dealings with and demeanor toward her, and to have tempered them, even to exhaustion, with all the gentility and kindness due from a husband to a member of his family, especially his wife."

This court has also declared that "the court, in hearing a divorce suit, is charged with the duty of protecting the public interests, as well as the rights of the parties themselves" and in Quinn v. Quinn, 279 Ky. 286, 130 S. W. 2d 834, 837, we said: "We have frequently, and without exception, declared that the marital relation on account of its sacredness and for the protection of society should not be annulled, except upon positive and competent evidence to establish the legal grounds, and that mere conclusions of witnesses, unsupported by facts fortifying them, would be insufficient to dissolve the bonds."

In addition to what we have declared to be the proper policy in the granting of absolute divorces we commend the reader to an article appearing in Kentucky State Bar Journal of March, 1946, on page 140, written by the Hon. John B. Rodes, an outstanding attorney of the Bowling Green Bar, approving and commending the observance of the court practice as outlined in the authorities supra.

According to the plaintiff's testimony he refused to admit into their home his wife after her brief stay with her parents, as hereinbefore outlined, and when she manifested her purpose and desire to return to her home he scornfully refused to take her in and informed her "that we were through and would not be living there any more", and that she could take whatever furniture she desired. That action on his part not only proved that he was not without "like fault", but that he abandoned her instead of her abandoning him.

The situation, therefore, comes within the class of cases to which we have referred, holding that a wife is entitled to alimony and other relief which the proof established, notwithstanding the court may have erroneously granted a divorce to her husband. That being true we conclude that the appellant in this case was entitled to an allowance of alimony to be measured by the facts shown by the testimony, not only that as given by plaintiff alone, but by proof which she might introduce in the case, and the same rule applies to the issue as to who should have permanent custody of the infant child of the parties. According to her present counsel appellant knew nothing of the submission of the cause for final judgment, since (according to the same authority) her husband had informed her that he would take no further steps in the case after the taking of his testimony without notifying her. Whether that statement by her last employed counsel should be taken into consideration or not, we are yet of the opinion that she should have an opportunity to develop her side of the case upon the two issues of alimony and custody of the infant child.

Wherefore, the judgment upon those two issues is reversed with directions to permit additional testimony to be taken and submitted if the parties desire to do so, and in any event appellant should be allowed alimony, the amount to be measured by the testimony now appearing in the record, but if additional proof should be taken, it should also be considered, and for such other orders as are not inconsistent with this opinion.